UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                                        Honorable Nancy G. Edmunds

                    Plaintiff,

vs                                      Case No. 18cr – 20559

D-1 KAMEL MOHAMMAD RAMMAL
and
D-2 NASSIF SAMI DAHER,

                    Defendants.
_____/

## MOTION TO DISCOVER EVIDENCE SECURED PURSUANT TO THE FOREIGN INTELLIGENCE SURVEILLANCE ACT OF 1978, AS AMENDED BY 50 U.S.C. §§ 1801 -1802

Defendant Nassif Sami Daher through lead counsel Amir Makled, assisted by Roy Carleton Howell, moves to discover evidence secured pursuant to the Foreign Intelligence Surveillance Act of 1978, as amended by 50 U.S.C. §§ 1801 - 1802.

In support of the motion, defendant submits a Brief with points and authorities.  Moreover, defendant also files an Order for the court's approval.

Respectfully submitted,

*/s/ Amir Makled*
Amir Makled (P76306)
Hall Makled
Attorney for Defendant Nassif Sami Daher

23756 Michigan 48124
Phone: (313) 788-8888
Email: amakled@hallmakled.com

**/s/ Roy Carleton Howell**
Roy Carleton Howell
Attorney for Defendant Nassif Sami Daher
(Admitted Eastern Dist. Mich. Southern Div.)
DC Bar # 415142
NY Bar # 4295457
W.Va. Bar # 4560
8003 Parkside Lane, NW
Washington, DC 20012
Phone: (202) 545-0750
Cell: (202) 445-3263
Email: professorhowell1954@yahoo.com

## CERTIFICATE OF SERVICE

I, Amir Makled, respectfully certify that a copy of the foregoing motion was filed *via* ECF and service of process was executed upon all counsel of record on this __8th_____ day of February 2019.

Respectfully submitted,

**/s/ Amir Makled**
Amir Makled (P76306)
Hall Makled
Attorney for Defendant Nassif Sami Daher
23756 Michigan 48124
Phone: (313) 788-8888
Email: amakled@hallmakled.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Honorable Nancy G. Edmunds

Plaintiff,

vs

Case No. 18cr – 20559

D-1 KAMEL MOHAMMAD RAMMAL
and
D-2 NASSIF SAMI DAHER,

Defendants.

_____/


**BRIEF IN SUPPORT OF MOTION TO DISCOVER EVIDENCE SECURED PURSUANT
TO THE FOREIGN INTELLIGENCE SURVEILLANCE ACT OF 1978, AS AMENDED
BY 50 U.S.C. §§ 1801 – 1812**

# TABLE OF CONTENTS

Table of Authorities…………………………………………………………iv, v, vi

Introduction………………………………………………………………….……..1

    a. The Background of Defendant Nassif Sami Daher………………...……..1

    b. Defendant Nassif Sami Daher is Not a Threat to National Security……..2

Argument………………………………………………………………….…..3

I. THE GOVERNMENT HAS PROVIDED NOTICE OF INTENT TO USE FOREIGN INTELLIGENCE SURVEILLANCE INFORMATION AT TRIAL………………………………………………….........………3

II. PURSUANT TO 50 U.S.C.A. § 1806(f) AN IN CAMERA AND *EX PARTE* REVIEW WILL TAKE PLACE BY THE DISTRICT COURT…………………………………………….…………………..3

III. DEFENDANT REQUESTS A COPY OF THE ATTORNEY GENERAL'S AFFIDAVIT ATTESTING THAT DISCLOSURE OF EVIDENCE WOULD HARM NATIONAL SECURITY…………….....5

IV. IT IS NECESSARY AND PROPER TO MAKE AN ACCURATE DETERMINATION OF THE LEGALITY OF THE SURVEILLANCE………………………………………………..……6

V. HERE *SUB JUDICE*, THE SURVEILLANCE WAS FOR DOMESTIC INTELLIGENCE INFORMATION, OR ALTERNATIVELY WAS A SIGNIFICANT AMOUNT OF NON-FOREIGN INTELLIGENCE INFORMATION, BOTH IN VIOLATION OF THE MINIMIZATION PROCEDURE………………………………………………...…7

    a. Agent of a Foreign Power Requirement…………………………8

    b. The Facts *Sub Judice* Do Not Justify FISA…………….....………8

VI.   FISA WAS USED BY THE GOVERNMENT FOR EVIDENCE GATHERING AGAINST AN AMERICAN DEFENDANT FOR DOMESTIC CRIMINAL INVESTIGATION AND PROSECUTION……………………………………………………..11

VII.   THE GOVERNMENT OBTAINED A FISA ORDER AGAINST DEFENDANT EVENTHOUGH THEIR PRIMARY PURPOSE WAS FOR DOMESTIC CRIMINAL PROSECUTION……………….…..13

VIII.   AN UNBROKEN LINE OF DECISIONS REQUIRES A TRADITIONAL WARRANT AND PROBABLY CAUSE FOR ELECTRONIC SURVEILLANCE AND PHYSICAL SEARCHES UNLESS A SIGNIFICANT PURPOSE OF THE GOVERNMENT ACTION IS THE COLLECTION OF FOREIGN INTELLIGENCE…………………...14

a.   Historical Background of Fourth Amendment to Electronic Surveillance………………………………………………………15

b.   Investigation of Domestic Criminal Activity is Not the *Raison d'etre* of National Security Surveillance…………..……………...……………21

Conclusion……………………………………………………………...……22

# TABLE OF AUTHORITIES

**CASES**:

\*<u>Alderman v. U.S.</u>, 394 U.S. 165 (1969)……………………………….…6, 7, 11

<u>American Civil Liberties Union v. Clapper</u>, 785 F. 3d 787, 792-793 (2d Cir. 2015)……………………………………………………….……………3

<u>Berger v. New York</u>, 388 U.S. 41 (1967)…………….……………………15, 16, 17

[*]<u>In Re Sealed Case</u>, 310 F.3d 717, 733 (Foreign. Int. Surv. Ct. Rev. (2002)……… …………………………………………………………....2, 11, 12, 13

<u>Katz v. United States</u>, 389 U.S. 347 (1967)…………………………..…15, 16

<u>Mincey v. Arizona</u>, 437 U.S. 385, 393 (1978)……………………………………17

<u>U.S. v. Aziz</u>, 288 F. Supp 3d 363 (M.D. Pa. 2017)……………………...….……..13

<u>U.S. v. Belfield</u>, 692 F.2d 141, 147 (D.C. Cir. 1982)………………………………7

<u>U.S. v. Butenko</u>, 494 F.2d 593, 606 (3d Cir. 1974)……………………………….21

<u>U.S. v. Duggan</u>, 743 F.2d 59, 70 (2d Cir. 1984)………………….…………11

<u>U.S. v. Duka</u>, 671 F.3d 329 (3d Cir. 2011)……………………….………5, 13

<u>U.S. v. Johnson</u>, 952 F.2d 565, 572 (1st Cir. 1991)……………………….…………21

<u>U.S. v. Mahamud</u>, 838 F. Supp.2d 881 (D. Minn. 2012)…………….…………7

<u>U.S. v. Thomas</u>, 752 F.Supp. 75, 79 (W.D. N.Y. 1990)……………...…………7

<u>U.S. v. U.S. District Court (Keith)</u>, 407 U.S. 297 (1972)………..……17, 18, 19, 20

---

[*] Authorities upon which we chiefly rely are marked with asterisks.

U.S. v. Warsame, 547 F.Supp.2d 982, 987 (D. Minn. 2008)…………………………7

**STATUTES**:

Foreign Intelligence Surveillance Act, 50 U.S.C. § 1806(c)………………………3

Foreign Intelligence Surveillance Act, 50 U.S.C. § 1806(f)/…………………..3, 4, 6

Foreign Intelligence Surveillance Act, 50 U.S.C. § 1806(k)……….…………..14

Foreign Intelligence Surveillance Act of 1978, as Amended by, 50 U.S.C. §§ 1801
1812…………………………………………………………….………..22

Foreign Intelligence Surveillance Act, 50 U.S.C. § 1804(a)(5)………………...…10

Foreign Intelligence Surveillance Act, 50 U.S.C. § 1805(a)(4)…………………..11

Foreign Intelligence Surveillance Act, 50 U.S.C. § 1804(b)……………….……..11

**CONGRESSIONAL RECORD:**

S. Rep. No. 95-701, at 63 (1978) (Intelligence Committee), 1978 U.S.C.C.A.N
3973, 4032……………………………………………………………..6

S. Rep. No. 95-701, at 64 (1978) (Intelligence Committee), 1978 U.S.C.C.A.N
3973, 4033……………………………………………………….……..6

147 Cong. Rec. S10593 (Oct. 11, 2001)……………………………...……….12

147 Cong. Rec. S11004 (Oct. 25, 2001)……………………………………..12

147 Cong. Rec. S11021 (Oct. 25, 2001)………………………...…………...13

**TREATISES**:

*Fishman and McKenna. Wiretapping and Eavesdropping § 12:92; December 2018. Part III. Title III. and FISA Applications and Orders, Chapter 12, Foreign

Intelligence and National Security Surveillance of Targets who are within the United States…………………….…………………………………………………………5, 6

*Carr, Patricia, and Creutz. Law of Electronic Surveillance, 2 Law of Electronic Surveillance § 9:46, October 2018. Chapter 9. Foreign Intelligence Surveillance IX. Minimization Under FISA………………………….…………………………...,,,10, 11

*Seamon and Gardner. "The Patriot Act And The Wall Between Foreign Intelligence, And Law Enforcement," 28 Harv. J.L. Pub. Pol'y 319 at 347 (Spring 2005)…………………….…………………………………………………...…12, 13

*Little and Quinn. "Attacking The Use of Physical Evidence Seized," (Agent of a Foreign Power Requirement) 40 Nov Champion 22 (November, 2016). National Association of Criminal Defense Lawyers, Inc…………………………………8

Jennifer C. Evans, "Hijacking Civil Liberties: The USA PATRIOT Act of 2001," 33 Loy. U. Chi. L.J. 933, 974-77 (2002)……………………………………….…...15

"Sharon H. Rackow," "How the USA PATRIOT Act Will Permit Governmental Infringement Upon the Privacy of Americans in the Name of 'Intelligence Investigations,' " 150 U. Pa. L. Rev. 1651, 1674-83 (2002)……………………….15

## OTHER PUBLICATIONS:

Evanier and Pantoliano, Who's Sorry Now: The True Story of a Stand-Up Guy (Createspace Independent Pub: November 30, 2012)……………………..……….2

## <u>INTRODUCTION</u>

**a.  The Background of Defendant Nassif Sami Daher**

Nassif Sami Daher was born on March 15, 1991 in Dearborn, Michigan at Oakwood Hospital (now Beaumont Hospital). He has never been convicted or a crime. As a typical "American boy" he grew up playing video games (e.g. "Grand Theft Auto," "Halo," "Call of Duty"). Sami, as he is called by friends, spent countless Saturdays at the movies memorizing the lines of Hollywood star Tom Cruz as he killed bad guys in <u>Mission Impossible</u>, and got the beautiful girls in <u>Risky Business</u>. Like any "American boy," Sami and his buddies exchanged stories about beautiful women, karate, guns and violence, money and travel.

Sami has never killed anyone, nor slept with Hollywood stars or the countless women on the cover of <u>Penthouse</u>. He never joined organized crime or terrorist groups.

Sami's ethnic heritage is Lebanese. He has visited family in Lebanon and was never convicted of a crime while abroad. He is not guilty or responsible for the acts of others in his Michigan community, or the Lebanese community of his extended family.

(**Guilt by Ethnic Association**)

In the biography of Italian-American actor Joseph Peter Pantoliano, he talks about growing up Italian in New Jersey. Growing up Italian in the 1950s and 60s in

1

Hoboken, NJ meant knowing neighbors involved in organized crime. *See*, <u>Who's Sorry Now: The True Story of a Stand-Up Guy</u> by Evanier and Pantaliano (Createspace Independent Pub: November 30, 2012). It is racist to assume Italian-American actor Pantiliano is Mafia because members of the mob lived in his neighborhood. Likewise, it is also racists to conclude that Sami is a terrorist because he visited family in Lebanon.

**b.  Defendant Nassif Sami Daher is Not a Threat to National Security.**

Sami is charged with the non-violent *malum prohibitum* offense of "food stamp fraud." The government has no evidence whatsoever that he committed a *malum in se* crime, or act(s) against National Security. FISA was used by the government for evidence gathering against Sami for domestic criminal investigation and prosecution beyond the scope of the statutory definition of "foreign intelligence information." *See*, <u>In Re Sealed Case</u>, 310 F.3d 717, 733 (Foreign Int. Surv. Ct. Rev. 2002).

Sami is a nerd with a big ego and imagination, but, he is not a terrorist or a National Security threat.

## **ARGUMENT**

### I.  **THE GOVERNMENT HAS PROVIDED NOTICE OF INTENT TO USE FOREIGN INTELLIGENCE SURVEILLANCE INFORMATION AT TRIAL.**

Pursuant to 50 U.S.C. § 1806(c) the government has provided defendant notice of their intent to use foreign intelligence surveillance information at trial.  This notice simply informed the defense that the government has FISA evidence, but provided absolutely no details regarding the reasons for the national security surveillance or any information thereto.

Congress enacted FISA in response to perceived abuses of intelligence-gathering and surveillance procedures by federal intelligence agencies in the early 1970s, See, American Civil Liberties Union v. Clapper, 785 F.3d 787, 792-793 (2d Cir. 2015).

The defense moves to discover all evidence, intelligence, counter-intelligence, FISA Application, FISA Order, and all information thereto concerning surveillance of defendant, and the national security justification for all governmental actions

### II.  **PURSUANT TO 50 U.S.C.A. § 1806(f) AN IN CAMERA AND *EX PARTE* REVIEW WILL TAKE PLACE BY THE DISTRICT COURT.**

When a defendant moves for discovery or suppression of FISA materials, 50 U.S.C.A. § 1806 (f) empowers the government to invoke an entirely different, in camera, *ex parte* process:

3

(f) In camera and *ex parte* review by district court

Whenever a court or other authority is notified pursuant to subsection (c) or (d) of this section, or whenever a motion is made pursuant to subsection (e) of this section, or whenever any motion or request is made by an aggrieved person pursuant to any other statute or rule of the United States or any State before any court or authority of the United States or any State to discover or obtain applications or orders or other materials relating to electronic surveillance or to discover, obtain, or suppress evidence or information obtained or derived from electronic surveillance under this chapter, the  United States district court in the same district as the authority, shall, notwithstanding any other law, if the Attorney General files an affidavit under oath that disclosure or an adversary hearing would harm the national security of the United States, review in camera and *ex parte* of the application, order, and such other materials relating to the surveillance as may be necessary to determine whether the surveillance of the aggrieved was lawfully authorized and   conducted.  In making this determination, the court may disclose to the aggrieved person, under appropriate security procedures and protective orders, portions of the application, order, or other materials relating to the surveillance only where such disclosure is necessary to make an accurate determination of the legality of the surveillance.

First, defendant requests an in camera and *ex parte* review by this court pursuant to 50 U.S.C.A. § 1806 (f).  Second, defendant demands disclosure and review of the FISA application, FISA Order, and or materials under appropriate security procedures and protective orders.

The government Attorney General must submit an affidavit to the court attesting under oath that disclosure or an adversary hearing would harm the national security.  "Once such an affidavit is submitted, issues relating to FISA surveillance can be resolved only in a U.S. District Court.  If the case is already pending in a

federal district court (*e.g.*, a federal criminal trial), it remains there for resolution of FISA issues."  *See*, Fishman and McKenna, Wiretapping and Eavesdropping § 12:92; December 2018.  Part III.  Title III and FISA Applications and Orders, Chapter 12.  Foreign Intelligence and National Security Surveillance of Targets who are within the United States.

"The government must give the district judge the FISA order, application, and any related materials that the judge may order produced.  The court then conducts an *ex parte*, in camera inspection of these materials to determine whether the surveillance was lawfully authorized and conducted."  *Id*., at p. 2.

## III.   DEFENDANT REQUESTS A COPY OF THE ATTORNEY GENERAL'S AFFIDAVIT ATTESTING THAT DISCLOSURE OF EVIDENCE WOULD HARM NATIONAL SECURITY.

In camera and *ex parte* review of all government national security evidence (the FISA application, FISA Order and all evidence cogent thereto) is necessary only if the Attorney General submits an affidavit attesting that disclosure would harm national security.  Defendant requests a copy of the Attorney General's affidavit attesting that disclosure of evidence would harm national security.

"The statute as originally enacted required a high-ranking member of the executive branch to certify that the purpose of the surveillance is to obtain foreign intelligence information." U.S. v. Duka, 671 F.3d 329, 338 (3d Cir. 2011).

Where the Attorney General fails to submit an affidavit attesting that disclosure would harm national security, in turn discovery and suppression litigation will be conducted in accordance with traditional procedural rules and concepts. *See,* S. Rep. No. 95-701, at 63 (1978) (Intelligence Committee), 1978 U.S.C.C.A.N. 3973, 4032.

## IV.   IT IS NECESSARY AND PROPER TO MAKE AN ACCURATE DETERMINATION OF THE LEGALITY OF THE SURVEILLANCE.

This court is empowered to disclose FISA related materials to defendant because "such disclosure is necessary to make an accurate determination of the legality of the surveillance." *See,* 50 U.S.C.A. § 1806 (f); *also see,* Fishman and McKenna, Wiretapping and Eavesdropping, *supra* at p. 2.

A Senate Intelligence Committee Report found that disclosures would be necessary where a district court judge discovers:

> indications of possible misrepresentation of fact, vague identification of the persons to be surveilled, or surveillance records which include a significant amount of non-foreign intelligence information, calling into question compliance with minimization standards contained in the [application and surveillance order]. In such cases . . . [disclosure] is necessary to make an accurate determination of the legality of the surveillance. *See,* S. Rep. No. 95-701, at 64 (1978) (Intelligence Committee), 1978 U.S.C.C.A.N. 3973, 4033, *Quoting* Alderman v. U.S., 394 U.S. 165 (1969).

"In determining whether disclosure is necessary, the court should consider whether after its initial review, and irregularities are revealed, such as whether: the

materials evidence a possible misrepresentation of fact; the persons to be surveilled are not clearly identified; or the surveillance records include a significant amount of non-foreign intelligence information, indicating a possible issue with the minimization standard utilized."  U.S. v. Mahamud, 838 F.Supp.2d 881 (D. Minn. 2012), citing U.S. v. Warsame, 547 F. Supp.2d 982, 987 (D. Minn. 2008), and U.S. v. Belfield, 692 F.2d 141, 147 (D.C. Cir. 1982), U.S. v. Thomas, 752 F.Supp. 75, 79 (W.D. N.Y. 1990).

In the case at bar, disclosure of FISA related materials to defendant is necessary and proper to make an accurate determination of the legality of the surveillance.

"The task of determining those items which might have made a substantial contribution to the preparation of the Government's case is too complex, and the margin for error too great, to rely solely upon the in camera examination by the trial court." Alderman v. United States, 394 U.S. 165, at 181-182. Here *sub judice*, as a matter of law and fact this court must provide defendant's counsel inspection and review of the FISA application, FISA Order, and all documents and materials thereto.

**V.  HERE *SUB JUDICE*, THE SURVEILLANCE WAS FOR DOMESTIC INTELLIGENCE INFORMATION, OR ALTERNATIVELY WAS A SIGNIFICANT AMOUNT OF NON-FOREIGN INTELLIGENCE INFORMATION, BOTH IN VIOLATION OF THE MINIMIZATION PROCEDURE.**

### a.  Agent of a Foreign Power Requirement

"Unlike a traditional warrant, the probable cause standard under FISA is not directed at whether there is sufficient information to believe that the defendant committed a crime. Instead, this requirement focuses on whether there is sufficient evidence to establish the relationship between the defendant and a foreign power (i.e. foreign government, political organization, terrorist group, etc.). Thus, the application must establish a reasonable, particularized ground for belief that the defendant himself qualifies as a foreign power, or, more likely, as an 'agent of a foreign power.' The complete definitions of 'foreign power' and 'foreign agent' are set forth in 50 U.S.C. § 1801. The specific probably cause requirement differs somewhat depending on whether the target is a United States Person." Little and Quinn. "Attacking The Use of Physical Evidence Seized," (Agent of a Foreign Power Requirement) 40 Nov Champion 22 (November, 2016).

### b.  The Facts *Sub Judice*, Do Not Justify FISA.

The indictment charges defendant with the domestic charges of "food stamp fraud."  The indictment against defendant states in relevant part:

> 2. Beginning sometime before March 2, 2016, continuing through May 2017, in the Eastern District of Michigan, southern Division, D-1 KAMEL MOHAMAD RAMMAL [RAMMAL] and D-2 NASSIF SAMI DAHER [DAHER], defendants, both directly and aiding and abetting one another, did, having devised a scheme to defraud and to obtain money from the USDA by means of false and fraudulent pretenses and representations, and for the purpose of executing that

scheme, caused the transmission of writing, signs and signals by means of wire and radio transmission in interstate commerce;

3. The object of the scheme to defraud and to obtain money by false and fraudulent pretenses and representations was to obtain SNAP funds from the USDA by purchasing benefits from SNAP recipients for cash at a fraction of their value, usually about 50% and then obtaining the full value of the benefits from the USDA by processing the transactions through S&R Petro's EBT terminal as though the beneficiary had purchased eligible items with the benefits, a process known as "discounting." The SNAP beneficiaries were willing to accept cash for their benefits at a highly discounted rate because it allowed them to use the benefits for any purpose, rather than being restricted to the purchase of eligible food items. The SNAP store engaged in discounting because it allowed the store to obtain money for nothing other than the use of its EBT terminal;

 4. On or about the dates indicated below, in the Eastern District of Michigan, southern division, the defendants specified below did, for the purpose of executing the above-described scheme to defraud, cause the transmission of writings, signs and signals by means of wire and radio transmission in interstate commerce, specifically signals from Detroit, Michigan to Austin, Texas, each such transmission representing a separate count of this indictment:

| COUNT: | DATE: | DEFENDANTS: |
|--------|-------|-------------|
| One | March 2, 2016 | D-1 KAMEL M. RAMMAL |
| Two | April 6, 2016 | D-1 KAMEL M. RAMMAL |
| Three | May 31. 2016 | D-1 KAMEL M, RAMMAL |
| Four | June 21, 2016 | D-1 KAMEL M. RAMMAL |
| Five | August 12, 2016 | D-1 KAMEL M. RAMMAL |
| Six | September 14, 2016 | D-1 KAMEL M. RAMMAL |
| Seven | December 13, 2016 | D-1 KAMEL M. RAMMAL |

| Eight | December 20, 2016 | D-1 KAMEL MRAMMAL |
| | | D-2 NASSIF DAHER |
| Nine | February 24, 2017 | D-1 KAMEL M. RAMMAL |
| Ten | March 21, 2017 | D-1 KAMEL M. RAMMAL |
| | | D-2 NASSIF DAHER |
| Eleven | April 27, 2017 | D-1 KAMEL M. RAMMAL |
| Twelve | April 28, 2017 | D-1 KAMEL M. RAMMAL |
| Thirteen | May 28, 2017 | D-1 KAMEL M. RAMMAL |
| | | D-2 NASSIF DAHER |
| Fourteen | May 29, 2017 | D-1 KAMEL M. RAMMAL |
| | | D-2 NASSIF DAHER |

All in violation in Sections 1343 and 2 of title 18 of the United States Code.

Defendant-2 NASSIF DAHER is alleged to have committed four domestic criminal transactions of "food stamp fraud." Defendant is charged with commission of four non-violent, *malum prohibitum* acts which have absolutely nothing to do with national security. Here, *sub judice*, the minimization procedures of FISA have been violated by the government.[1] Section 1804(a)(5) of FISA requires that the application for a FISA court order must contain "a statement of the proposed

---

[1] The adequacy of minimization has been determined on the basis of a review of the monitors' logs. U.S. v. Hovsepian, 1985 WL 5970 (C.D. Cal. 1985). "The minimization requirement obligates the government to make a good-faith effort to minimize the acquisition and retention of irrelevant information." Carr, Patricia, and Creutz. Law of Electronic Surveillance, 2 Law of Electronic Surveillance § 9:46, October 2018. Chapter 9. Foreign Intelligence Surveillance IX. Minimization Under FISA.

minimization standard." *See,* <u>U.S.</u> v. <u>Duggan</u>, 743 F.2d 59, 70 (2d Cir. 1984).

Section 1805(a)(4) states that the FISA judge to whom the application has been made must find that "the proposed minimization procedures meet the definition of minimization procedures under  1804(b) of the title."  Carr, Patricia, and Creutz. Law of Electronic Surveillance, 2 Law of Electronic Surveillance § 9:46, October 2018. Chapter 9.  Foreign Intelligence Surveillance IX.  Minimization Under FISA.

"If the surveillance is found to have been unlawful, and if a petitioner is found to have standing, the Government must disclose to him the records of those overheard conversations which the Government was not entitled to use in building its case against him." <u>Alderman v. United States</u>, 394 U.S. 165, at 180-185.

## VI.   FISA WAS USED BY THE GOVERNMENT FOR EVIDENCE GATHERING AGAINST AN AMERICAN DEFENDANT FOR DOMESTIC CRIMINAL INVESTIGATION AND PROSECUTION.

In the case at bar, FISA was used by the government for evidence gathering against an American defendant for domestic criminal investigation and prosecution beyond the scope of the statutory definition of "foreign intelligence information." <u>In Re Sealed Case</u>, 310 F.3d 717, 733 (Foreign Int. Surv. Ct. Rev. 2002).

> To be sure, some Senate judiciary committee members including the Chairman were concerned that the amendment might grant too much authority to the Justice Department – and FISA court.  Senator Leahy indicated that the change to significant purpose was "very problematic" since it would "make it easier for the FBI to use a FISA wiretap to obtain information  where  the  Government's  most  important

motivation for the wiretap is for use in a criminal prosecution. 147 Cong. Rec. S10593 (Oct. 11, 2001). Therefore he suggested that "it will be up to the courts to determine how far law enforcement agencies may use FISA for criminal investigation and prosecution beyond the scope of the statutory definition of "foreign intelligence information," 147 Cong Rec. S11004 (Oct. 25, 2001). *Also see,* In Re Sealed Case, *supra* at p. 733.

In the case at bar, it is within this court's authority to determine whether the government may use FISA for purely domestic criminal investigation and prosecution beyond the scope of the statutory definition of foreign intelligence information.

"Furthermore, if the proposed target is a U.S. person, the judge must determine that the certifications and statements are not 'clearly erroneous.'…the most important certifications subject to judicial review under this standard are that: (1) the information to be obtained is 'foreign intelligence information;' and (2) 'the purpose' (under the original FISA) or 'a significant purpose' (under the FISA as amended by the Patriot Act) of the proposed surveillance 'is to obtain foreign intelligence information.' Also important are the requirements that the certifying official designate the type of information sought, using the typology of the FISA's definition of 'foreign intelligence information,' and state the basis for his or her certification that the information is the type of foreign intelligence information designated. All of these add up to a requirement that the purpose (or a significant purpose) of the proposed surveillance of a foreign power or its agents be to obtain

one of the three types of counterintelligence or one of the two types of (plain) intelligence identified in the FISA's definition of 'foreign intelligence' information." Seamon and Gardner. "The Patriot Act And The Wall Between Foreign Intelligence, And Law Enforcement," 28 Harv. J.L. Pub. Pol'y 319 at 347 (Spring 2005).

"Among other things the PATRIOT Act amended FISA to require certification that foreign intelligence gathering is 'a significant purpose' rather than 'the purpose' of the surveillance or search intended." U.S. v. Duka, 671 F.3d 329 at 336-337 (3d Cir. 2011); also see, U.S. v. Aziz, 228 F. Supp. 3d 363 (M.D. Pa. 2017).

## VII. THE GOVERNMENT OBTAINED A FISA ORDER AGAINST DEFENDANT EVENTHOUGH THEIR PRIMARY PURPOSE WAS FOR DOMESTIC CRIMINAL PROSECUTION.

Here, *sub judice*, the government obtained a FISA Order against defendant even though their primary purpose was for a domestic criminal prosecution, and their action(s) violated the Fourth Amendment. In Re Sealed Case, 310 F.3d 717, 733 (Foreign Int. Surv. Ct. Rev. 2002).

> Senator Feingold recognized that the change to "significant purpose" meant that the government could obtain a FISA warrant "even if the primary purpose is a criminal investigation," and was concerned that this development would not respect the protections of the Fourth Amendment. 147 Cong. Rec. S11021 (Oct. 25, 2001). *Also see,* In Re Sealed Case, Id. at p. 733.

Congress recognized the dangers inherent in intelligence (or counterintelligence) gathering and domestic law enforcement by consummation of § 1806 k:

(k) Consultation with Federal law enforcement officer

    (1) Federal officers who conduct electronic surveillance to acquire foreign intelligence information under this title may consult with Federal law enforcement officers to coordinate efforts to investigate or protect against

        a. Actual or potential attack or other grave hostile acts of a foreign power or an agent of a foreign power; or

        b. Sabotage or international terrorism by a foreign power or an agent of a foreign power; or

        c. Clandestine intelligence activities by an intelligence service or network of a foreign power.

First, in the case at bar, is there evidence of "actual or potential attack or other grave hostile acts of a foreign power or an agent of a foreign power." The answer is no. Second, is there evidence of "sabotage or international terrorism by a foreign power or an agent of a foreign power." The answer is no. Third, is there evidence of "clandestine intelligence activities by an intelligence service or network of a foreign power or by an agent of a foreign power." The answer is no. Defendant has committed none of the above international criminal acts. The government's case must be dismissed with prejudice for violation of § 1806 (k).

## VIII. AN UNBROKEN LINE OF DECISIONS REQUIRES A TRADITIONAL WARRANT AND PROBABLE CAUSE FOR ELECTRONIC SURVEILLANCE AND PHYSICAL SEARCHES UNLESS A "SIGNIFICANT PURPOSE" OF THE GOVERNMENT ACTION IS THE COLLECTION OF FOREIGN INTELLIGENCE.

FISA, both in its original form and as amended by the USA PATRIOT Act, does not permit criminal investigators to use the statute to conduct domestic criminal investigations. The use of FISA to conduct domestic criminal investigations violates the Fourth Amendment prohibition against unreasonable searches and seizures. [2]

### a. Historical Background of Fourth Amendment to Electronic Surveillance

The Supreme Court first applied the Fourth Amendment to electronic surveillance fifty two years ago in Katz v. United States, 389 U.S. 347 (1967), and Berger v. New York, 388 U.S. 41 (1967). Katz involved the surreptitious recording of telephone calls though a recording device attached to the outside of a telephone booth. The Katz Court declared "[t]he Government's activities in electronically listening to and recording the petitioner's words violated the privacy upon which he justifiably relied while using the telephone booth and thus constituted a 'search and seizure' within the meaning of the Fourth Amendment." Id. at 353. The Court held that the warrantless surveillance violated the Fourth Amendment, in part because the government agents failed, "before commencing the search, to present their estimate of probable cause for detached scrutiny by a neutral magistrate." Id. at 356. The Court rejected the government's request for a "telephone booth" exception to the

---

[2] For discussions of the Fourth Amendment implications of the "significant purpose" provisions, see Jennifer C. Evans, Hijacking Civil Liberties: The USA PATRIOT Act of 2001, 33 Loy. U. Chi. L.J. 933, 974-77 (2002), and Sharon H. Rackow, How the USA PATRIOT Act Will Permit Governmental Infringement Upon the Privacy of Americans in the Name on "intelligence' Investigations, 150 U. Pa. L. Rev. 1651, 1674-83 (2002),

warrant requirement. _Id_. at 358. It expressly left open however, "[w]hether safeguards other than prior authorization by a magistrate would satisfy the Fourth Amendment in a situation involving the national security." _Id_. at 358 n.23.

In _Berger_, which arose from electronic surveillance conducted by state law enforcement officers, the Court emphasized that the traditional probable cause and particularity requirements apply to warrants or other orders authorizing such surveillance. _See_ 388 U.S. at 55-56. The Court found that the New York Statute authorizing the surveillance violated the Fourth Amendment (1) because it did not "require belief that any particular offense has been or is being committed; nor that the 'property' sought, the conversations, be particularly described"; (2) because it failed to limit the duration of the surveillance or to impose sufficiently stringent requirements on renewals of the authorizations; and (3) because the statute "has no requirement for notice as do conventional warrants, nor does it overcome this defect by requiring some showing of special facts." _Id_. at 58-60.

_Berger_ rejected the state's argument that Fourth Amendment requirements should be relaxed because the surveillance statute was essential in its fight against organized crime. In terms that ring as true as today as they did half a century ago, the Court declared:

> [W]e cannot forgive the requirements of the Fourth Amendment
> in the name of the law enforcement. This is no formality that we
> require today but a fundamental rule that has long been recognized

as basic to the privacy of every home in America. While the requirements of the Fourth Amendment are not inflexible, or obtusely unyielding to the legitimate needs of law enforcement, it is not asking too much that officers be required to comply with the basic command of the Fourth Amendment before the innermost secrets of one's home or office are invaded. Few threats to liberty exist which are greater than that posed by the use of eavesdropping devices.

388 U.S. at 62-63 (quotation and citation omitted); *see, e.g.*, Mincey v. Arizona, 437 U.S. 385, 393 (1978) ("[T}he mere fact that law enforcement may be made more efficient can never by itself justify disregard of the Fourth Amendment…. The investigation of crime would always be simplified if warrants were unnecessary. But the Fourth Amendment reflects the view of those who wrote the Bill of Rights that the privacy of a person's home and property may not be totally sacrificed in the name of maximum simplicity in enforcement of the criminal law.") The FISA opinion makes clear that the "threat to liberty" that eavesdropping poses only has grown with technological advances over the past decades.

The Supreme Court addressed the limits that the Fourth Amendment places on electronic surveillance conducted in the name of national security in United States v. United States District Court (Keith), 407 U.S. 297 (1972). Keith considered the constitutional limits on surveillance directed at domestic security threats; the Court noted that the case "requires no judgement on the scope of the President's surveillance power with respect to the activities of foreign powers, within or without

17

this country." *Id*. at 308; *see id*. at 321-22 ('We have not addressed, and express no opinion as to, the issues which may be involved with respect to activities of foreign powers or their agents.") Although the Court recognized both the weight of the executive's interest in protecting the national security and the value of electronic surveillance in detecting security threats, it found that "[t]here is understandably, a deep-seated uneasiness and apprehension that this [surveillance] capability will be used to intrude upon cherished privacy of law-abiding citizens. We look to the Bill of Rights to safeguard this privacy." *Id*. at 312-13 (footnote omitted). The Court emphasized the need to protect both First and Fourth Amendment rights against government investigation based on alleged threats to national security:

> History abundantly documents the tendency of Government— however benevolent and benign its motives— to view with suspicion those who most fervently dispute its policies. Fourth Amendment protections become more necessary when the targets of official surveillance may be those suspected of unorthodoxy in their political beliefs. The danger to political dissent is acute where the Government attempts to act under so vague a concept as "domestic security." Given the difficulty of defining the domestic security interest, the danger of abuse in acting to protect that interest becomes apparent. *Id*. at 314.

The Court emphasized the importance of the Fourth Amendment warrant requirement in protecting the right of privacy. It identified as "the very heart of the Fourth Amendment directive" that

where practical, a governmental search and seizure should represent both the efforts of the officer to gather evidence of wrongful acts and the judgement of the magistrate that the collected evidence is sufficient to justify invasion of a citizen's private premises or conversation. Inherent in the concept of a warrant is its issuance by a "neutral and detached magistrate." The further requirement of "probable cause" instructs the magistrate that baseless searches shall not proceed. *Id*. at 316 (citations omitted).

Furthermore, the Court made clear that the decision to conduct electronic surveillance cannot be left to the discretion of law enforcement officials:

These Fourth Amendment freedoms cannot properly be guaranteed if domestic security surveillances may be conducted solely within the discretion of the Executive Branch. The Fourth Amendment does not contemplate the executive officers of Government as neutral and disinterested magistrates. Their duty and responsibility are to enforce the laws, to investigate, and to prosecute. But those charged with this investigative and prosecutorial duty should not be the sole judges of when to utilize constitutionally sensitive means in pursuing their tasks. The historical judgement, which the Fourth Amendment accepts, is that unreviewed executive discretion may yield too readily to pressures to obtain incriminating evidence and overlook potential invasions of privacy and protected speech. *Id*. at 316-17 (citation and footnote omitted).

The Court rejected the executive's argument that an exception to the Fourth Amendment warrant requirement should be recognized for domestic security surveillance. In particular, the Court did not find persuasive the executive's claims that "internal security matters are too subtle and complex for judicial evaluation"

and that "prior judicial approval will fracture the secrecy essential to official intelligence gathering." *Id*. at 320.

Finally, <u>Keith</u> underscored the differences between surveillance for criminal investigative purposes and surveillance for intelligence purposes. It noted, for example, that "[t]he gathering of security intelligence is often long range and involves the interrelation of various sources and types of information"; that "[t]he exact targets of such surveillance may be more difficult to identify than in surveillance operations against many types of crimes specified in Title III"; and that "[o]ften, too, the emphasis of domestic intelligence gathering is on the prevention of unlawful activity or the enhancement of the Government's preparedness for some possible future crisis or emergency." *Id*. at 322. In light of these "potential distinctions between Title III criminal surveillances and those involving the domestic security," the Court suggested that Congress "may wish to consider protective standards for the latter which differ from those already prescribed for specified crimes in Title III," *id*.--a suggestion that led ultimately to the enactment of FISA in 1979. The Court added that "[d]ifferent standards may be compatible with the Fourth Amendment if they are reasonable both in relation to the legitimate need of Government <u>for intelligence information</u> and the protected rights of our citizens." *Id*. at 322-23 (emphasis added).

### b.  Investigation of Domestic Criminal Activity Is Not the *Raison d'etre* of National Security Surveillance

A synthesis of <u>Katz</u>, <u>Berger</u>, and <u>Keith</u> draws a line between surveillance conducted by law enforcement officials for the purpose of investigating crime-- which requires the traditional warrant based on probable cause, as outlined in <u>Berger</u> and codified in 18 U.S.C § 2518--and surveillance conducted by intelligence officials for the purpose of obtaining intelligence information for national security.

The USA PATRIOT Act, both Title III and FISA clearly recognized this constitutionally-mandated distinction. And in the many years following <u>Keith</u>, before and after the enactment of FISA, courts have relied upon the Supreme Court's distinction between "criminal surveillances" and surveillance conducted for intelligence purposes to hold that electronic surveillance may proceed without the protections of a traditional warrant based on probable cause only if a court determines that the "significant purpose" of the surveillance is to obtain foreign intelligence information. *See, e.g.*, <u>United States v. Johnson</u>, 952 F.2d 565, 572 (1st Cir. 1991). FISA is not to be used as an end around the Fourth Amendment.

<u>United States v. Butenko</u>, 494 F.2d 593, 606 (3d Cir. 1974) (*en banc*) ("Since the primary purpose of these searches is to secure foreign intelligence information, a judge, when reviewing a particular search must, above all, be assured that this was in fact its significant purpose and that the accumulation of evidence of criminal activity was incidental.") In the case at bar the purpose of the FISA Order was to

secure foreign intelligence for National Security. However, the government's evidence gathering against defendant was *per-se* for domestic criminal prosecution. Defendant is alleged to have committed non-violent *malum prohibitum* acts, which have absolutely nothing whatsoever to do with National Security.

## **<u>CONCLUSION</u>**

The defendant's Motion To Discover Evidence Secured Pursuant To The Foreign Intelligence Surveillance Act Of 1978, As Amended By 50 U.S.C. §§ 1801 -1812 must be granted as a matter of law and fact. Wherefore, this court should do the following:

(1) Compel the government to determine if the Attorney General will submit an affidavit attesting that disclosure of FISA application, FISA Order, and all cogent materials thereto would harm national security;

(2) Where the Attorney General submits an affidavit, this court should provide defendant a copy of that affidavit;

(3) This court should as a matter of law conduct an in camera, *ex parte* inspection, review of the FISA application, FISA Order, and all cogent materials thereto, and determine whether the surveillance was lawfully authorized and appropriately conducted;

(4) This court should disclose FISA application, FISA Order, and all cogent materials thereto to defendant's counsels because such disclosures are

necessary to make an accurate determination of the legality of the surveillance.

Respectfully submitted,

 */s/ Amir Makled*
Amir Makled (P76306)
Hall Makled
Attorney for Defendant Nassif Sami Daher
23756 Michigan 48124
Phone:  (313) 788-8888
Email:  amakled@hallmakled.com

*/s/ Roy Carleton Howell*
Roy Carleton Howell
Attorney for Defendant Nassif Sami Daher
(Admitted Eastern Dist. Mich. Southern Div.)
DC Bar # 415142
NY Bar # 4295457
W.Va. Bar # 4560
8003 Parkside Lane, NW
Washington, DC 20012
Phone:  (202) 545-0750
Cell:  (202) 445-3263
Email:  professorhowell1954@yahoo.com